UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:06-cr-115 |
| v. ) | |
| ) | Judge Mattice |
| PETE RESA and ) | |
| BETINA M. HERNANDEZ ) | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant Pete Resa's Motion to Suppress [Court Doc. 39]. Mr. Resa seeks to exclude from evidence at the trial of this matter all items seized in connection with a traffic stop on October 16, 2006, which Mr. Resa contends was made without probable cause. Mr. Resa also contends that even should the Court find that the traffic stop itself was supported by probable cause, the subsequent search of the vehicle in which Mr. Resa was traveling exceeded the scope of any consent which Mr. Resa may have given, particularly insofar as the search involved destruction of portions of the vehicle's interior.

Having considered the evidence presented at the hearing of this matter and the submissions of counsel, and for the reasons set forth below, Mr. Resa's instant Motion to Suppress will be **DENIED.**

**I.     RELEVANT FACTS**

An evidentiary hearing on the instant motion was held before the undersigned on August 2, 2007. Representing the Government was Assistant United States Attorney Christopher D. Poole. Representing Defendant Resa was attorney Christopher W. Lewis.

The only witness called was Eduardo Choate, formerly an interdiction officer in the drug enforcement unit of the Bradley County Sheriff's Office. A summary of the relevant testimony is as follows.

*Eduardo Choate*

Eduardo Choate was employed as a patrolman and later as an interdiction officer in the drug enforcement unit of the Bradley County Sheriff's Office from June of 2002 to May of 2007.[1] As an interdiction officer, Officer Choate was charged with enforcing traffic laws along I-75 within the borders of Bradley County, Tennessee. In accordance with those duties, Officer Choate made a stop of the vehicle in which the Defendants, Mr. Resa and Ms. Hernandez, were traveling at approximately 4:00 p.m. on the afternoon of October 16, 2006.

On that afternoon, it was raining and an AMBER Alert had been issued, instructing law enforcement officers to be on the lookout for a gold SUV traveling southbound on I-75. Accordingly, Officer Choate was in his vehicle on top of a bridge crossing I-75, and spotted a gold SUV traveling southbound without its headlights on. Because the vehicle matched the description provided in the AMBER Alert, and because the operator of the vehicle was not using the headlights in rainy weather as required by law, Officer Choate pulled his vehicle off the bridge and onto I-75 southbound and began following the gold SUV. As he caught up to the gold SUV and was able to read the license tag, he called in a computer search of the tag number and learned that the vehicle was a 2006 Toyota 4-Runner, registered to Enterprise Leasing Company of Chicago. After Officer Choate activated his

---

[1] Since he was employed as a deputy sheriff at all times relevant hereto, Mr. Choate will be referred to herein as "Officer Choate."

emergency equipment, the gold SUV pulled to the shoulder of I-75. Officer Choate approached the passenger side of the vehicle and advised the driver, Mr. Resa, that he was being pulled over because his headlights were not turned on in rainy weather. Mr. Resa responded that his headlights were indeed on, and pointed to the dashboard of the vehicle. Officer Choate observed the headlight indicator on the dashboard, which did indicate that the headlights of the vehicle were on. Checking again, however, Officer Choate determined that, notwithstanding the dashboard indicator, neither the headlights nor the taillights of the vehicle were operating.[2]

Following this initial exchange, Officer Choate asked the occupants of the vehicle some routine questions about their driver's license status and about the ownership of the vehicle. Although Mr. Resa could produce a driver's license and provided Officer Choate with a rental agreement,[3] Officer Choate found it curious that neither of the occupants of the vehicle could answer very basic questions about how they came to be in possession of it. The rental agreement indicated that the renter of the vehicle was "R. Walkin", which was different from the name on the driver's license which Mr. Resa produced. Officer Choate testified that the Bradley County Sheriff's Department had received several complaints from car rental agencies, such as Enterprise, about individuals who were not authorized to be drive rental vehicles under the terms of the rental contract but were stopped driving rental vehicles.

---

[2] That the taillights were not operating is confirmed by Government's Exhibit No. 2, which is the videotape from the onboard camera in Officer Choate's vehicle, which automatically began to record when he activated his emergency equipment.

[3] The rental agreement was introduced into evidence as Government's Exhibit No. 1. The Court notes that neither Mr. Resa or Ms. Hernandez are listed as persons authorized to drive the subject vehicle.

As Officer Choate pressed both Mr. Resa and Ms. Hernandez further about the circumstances under which they came to be in possession of the vehicle, Mr. Resa attempted to explain that he had taken a flight from Dallas to Chicago to see his uncle. He then intended to drive the rental vehicle to Atlanta. Ms. Hernandez, on the other hand, told Officer Choate that she and Mr. Resa had driven to Chicago in her vehicle, but once they arrived in Chicago, her vehicle had developed brake problems, and it was necessary for them to rent the car in which they were traveling to go to Atlanta. As Officer Choate questioned Mr. Resa and Ms. Hernandez separately, he made several attempts to try to reconcile their stories about the circumstances under which they had come to be in possession of the gold SUV. Despite such attempts, their stories became increasingly divergent and confusing, and Officer Choate became suspicious that Mr. Resa and Ms. Hernandez were lying to him. Officer Choate testified that his suspicions were further aroused by the Defendants' reference to the cities of Dallas, Chicago, and Atlanta. Based on his training and experience as a narcotics enforcement officer, Officer Choate was aware that all of those cities were known as major drug distribution points. In view of these developments, Officer Choate decided to contact his partner to assist him. He also contacted the Blue Lightning Operations Center (or "BLOC") to try to learn more information about the vehicle in which Mr. Resa and Ms. Hernandez were traveling.

After calling for back-up by his partner and running a check with BLOC, Officer Choate told Mr. Resa of his suspicions and ask for permission to search the vehicle and all of his (Mr. Resa's) belongings inside the vehicle. Mr. Resa granted Officer Choate permission to search. Separately, Ms. Hernandez also gave her consent to a search of the vehicle and her belongings in the vehicle. According to Officer Choate, he advised both

Ms. Hernandez and Mr. Resa that he was searching for drugs, U.S. currency, and firearms or any other illegal contraband which might be in the vehicle.

Officer Choate testified that, based on his training and experience as a narcotics investigator, he tended to look for a "natural void" in a vehicle that could be used to conceal contraband. On the date in question, Officer Choate noticed that the rear door of the vehicle could not be opened. Officer Choate then re-checked the rental agreement and noted that it reflected that there was a defective rear cargo door and window on the vehicle. Officer Choate's suspicions were thus further aroused, because he thought it curious that such a relatively new vehicle would be rented by Enterprise with such a major malfunction. Officer Choate then noticed the notation of the defective rear cargo door and window seemed to be written in a different type ink from the other writing on the rental agreement. Inspecting more closely, and after removing some of the rear seats in the vehicle in order to access its rear compartment other than through the defective rear cargo door, Officer Choate and his partner found indications that the rear cargo door had been tampered with. Delving further into the vehicle, Officer Choate and his partner removed some interior fittings and foam insulation inside the rear cargo door and ultimately discovered several packages of methamphetamine.

In his testimony, Officer Choate described a kit of instruments and equipment used at that time by the Bradley County Sheriff's Department in the inspection and investigation of vehicles suspected of concealing narcotics or other contraband. The kit itself was referred to as the "Scope." It contained devices such as the "Canine Buster" and a density meter. Officer Choate described the operation of the density meter. Upon being placed on the outside walls of a vehicle or tires, it will register the thickness, or density, of the walls

of what might appear to be an empty compartment. Officer Choate testified that he had received training in the use of this equipment while employed by the Bradley County Sheriff's Department. Officer Choate also testified that the instruments in the Scope kit, including the density meter, had been used numerous times in other traffic stops by him and by other employees of the Sheriff's Department.

Officer Choate testified that on the date in question he had used the density meter on the rear compartment of the vehicle before deciding to disassemble it. Based on the readings of the density meter, Officer Choate determined that the rear compartment registered an unusually thick density from what would normally be expected. He also testified that on the same date he had used a calibration device to establish that the density meter was working properly.

On cross-examination, Officer Choate testified that the license tag of the vehicle in which Mr. Resa and Ms. Hernandez were traveling was issued by the State of Illinois. He could not recall whether the AMBER Alert on the date in question had indicated that the tag of the gold SUV which was the subject of the Alert was from Illinois. He stated, however, that he stopped the vehicle in which the Defendants were traveling not only because of its similarity to the vehicle described in the AMBER Alert, but also because it was raining and, according to Officer Choate's interpretation of Tennessee law, the weather conditions required the vehicle to have its headlights on.[4]

---

[4] In his testimony, Officer Choate recited the relevant portions of the Tennessee statute on which he was relying in stopping the vehicle based on the absence of headlights as:

> Operation of headlights during periods of rain, as required in this section shall be made during anytime when rain, mist, or other precipitation, including snow, necessitates the constant use of windshield wipers by motorists.

Officer Choate was apparently reading from the provisions of Tenn. Code Ann. § 55-9-406(b)(1).

Officer Choate also testified that based on the description of the vehicle in the AMBER Alert, he probably would have attempted to stop every gold SUV that he saw traveling southbound on I-75 on the date in question. He determined that it was not the vehicle identified in the AMBER Alert only after he reviewed the paperwork provided to him by Mr. Resa and observed that there was not a child in the car.

Officer Choate agreed with defense counsel that the video taken from the on-board camera of his police vehicle begins at around 3:49 p.m. He explained that the weather conditions reflected by that video, however, were several minutes later and seven miles distant from the time and location at which he made his determination to stop the Defendants' vehicle based on weather conditions. Officer Choate also testified that on the date in question, his on-board camera had been automatically activated by the activation of the vehicle's emergency equipment, and that while it was possible for him to manually switch the camera on, he had not done so.

On cross-examination, defense counsel pointed out that Officer Choate had made no mention of the AMBER Alert at an earlier detention hearing for the Defendants. Officer Choate admitted that upon first approaching the vehicle in which the Defendants were riding, he did not notice anything out of the ordinary with regard to the interior compartment of the vehicle, and that neither Mr. Resa nor Ms. Hernandez had seemed to be excessively nervous. He also testified that the driver's license which Mr. Resa had handed to him during the stop was issued by the State of Texas.

Defense counsel pointed out that, contrary to Mr. Choate's testimony on direct examination, Mr. Resa had first told Officer Choate that the vehicle in question had been rented by his uncle only after Officer Choate had already ask Mr. Resa to exit the vehicle,

and not before. Defense counsel also pointed out that the name of the renter reflected on the rental agreement as "R. Walkin," may not have been intended to be an actual name of a renter, but instead was merely meant to signify that the customer in question had been a "walk-in"–meaning that the renter had not made a reservation before renting the vehicle. Under cross-examination, Officer Choate admitted that this was a possible explanation for what Officer Choate perceived to be a discrepancy between the information provided to him by Mr. Resa and Ms. Hernandez and the information reflected on the vehicle rental agreement. Officer Choate also testified that his initial purpose in asking Mr. Resa to exit the vehicle was to demonstrate to him that, notwithstanding the vehicle's dashboard indicators, his taillights and headlights were not operational.

When Officer Choate ask Mr. Resa the name of the person who rented the vehicle, Mr. Resa's response was "Primo." He testified that the word "Primo" means "cousin" in Portuguese, not "uncle." Officer Choate also testified that based on his knowledge of Hispanic culture, Hispanics often use the word "Primo" to describe not just a cousin, but also other people, including a brother or a friend. Officer Choate stated that while he was carrying on the conversation with Mr. Resa outside of the vehicle following the traffic stop, it was his intention to eventually give Mr. Resa a traffic citation for failure to have his headlights on during precipitation, as required by Tennessee law.

When asked by defense counsel how long it typically took him to write a citation, Officer Choate responded that it took as long as required for him to gather the information he needed, receive results of computerized checks, and to fill out the paperwork. Officer Choate testified that 15 to 20 minutes might be a typical average time to write such a citation in Tennessee. Defense counsel pointed out that a number of questions which

Officer Choate posed to Mr. Resa were not related to the offense of driving without headlights in inclement weather. Officer Choate agreed with this observation, but reiterated his direct testimony that Mr. Resa's and Ms. Hernandez's inability to give prompt and confident answers to simple questions had aroused his suspicion, suggesting the need for further questioning.

Defense counsel attempted to get Officer Choate to admit that, rather than giving conflicting accounts as to who actually rented the vehicle in question as he (Officer Choate) had suggested, Mr. Resa and Ms. Hernandez, had both indicated that it was Mr. Resa's uncle who had rented the vehicle. Defense counsel also attempted to get Officer Choate to acknowledge that the word "Primo" could have referred to Mr. Resa's uncle. In addition, defense counsel attempted to persuade Officer Choate to acknowledge that what he perceived as discrepancies in the type of vehicle that Ms. Hernandez stated that she had driven to Chicago could have been reconciled. Officer Choate responded to all such lines of questions that, notwithstanding that he may have misunderstood some of the information which was provided to him by Mr. Resa and Ms. Hernandez, it was the totality of the suspicious nature of their answers which caused him to extend their detention at the side of the road.

Defense counsel showed Officer Choate a series of receipts, marked as Defendant's Exhibits 1, 2, 3, 4 & 5, which Officer Choate had seized at the time of the traffic stop in question. Among the receipts were some from Chicago, Illinois, which Defense counsel used to attempt to demonstrate that Mr. Resa's and Ms. Hernandez's statement about traveling to Chicago and renting a car there were consistent. Defense counsel also produced a receipt that included the name "Primo", from Joplin, Missouri.

Defense counsel used this to suggest that Mr. Resa's and Ms. Hernandez's story of traveling from Dallas to Chicago was also consistent. Another receipt, from Wagner, Oklahoma, was introduced for the same purpose as was another receipt from Carlinville, Illinois.

Defense counsel also used the receipts to point out that Mr. Resa and Ms. Hernandez may have traveled to Chicago on at least two separate occasions within close proximity during the period in question, so as to suggest that, unless Officer Choate's question to them about their trips were quite specific, they may have simply made a mistake rather than intentionally lying to him. Officer Choate responded that at the time he had made the traffic stop, he had not had the time or opportunity to analyze in detail the receipts which he had taken.

Defense counsel attempted to get Officer Choate to admit that the real reason for his extended questioning and detention of Mr. Resa and Ms. Hernandez was that he suspected that they were transporting illegal narcotics, rather than for a traffic violation. In support of this contention, defense counsel pointed to the fact that in one of his earlier written statements regarding the arrest, Officer Choate had stated that his suspicions were raised when he saw a rosary hanging from the rearview mirror of the vehicle because he knew that a rosary or cross is a recognized sign of drug traffickers who are seeking protection on their journey. In response, Officer Choate stated that, because the Roman Catholic faith is common among people of Hispanic heritage, and because it is well known within law enforcement circles that Hispanics are disproportionately over-represented among drug traffickers, a rosary or cross would be consistent with this observation as well.

Officer Choate again stated, however, that it was the totality of the facts and circumstances surrounding this incident, and not any one specific factor, that led to his suspicions.

Officer Choate admitted on cross-examination that, having run the tag on the vehicle in question, he knew before he stopped it that it had not been reported as stolen. He also admitted that while it may be contrary to the terms of a renter's contract with a vehicle rental agency, driving a rental vehicle while not authorized to do so is not a criminal offense.

Defense counsel and Officer Choate sparred over whether his main activity as an interdiction officer was to detect and arrest narcotics traffickers or to enforce the traffic laws. Officer Choate insisted that while he was charged with enforcing traffic laws, his job also incorporated the enforcement of all laws, including those pertaining to illegal drugs. Defense counsel pointed out that from the time that Officer Choate activated his emergency equipment to the time that the illegal narcotics were discovered approximately one hour and ten minutes elapsed. As Officer Choate pointed out, however, according to the videotape, Mr. Resa provided his consent to the search of the vehicle approximately seventeen minutes after the emergency equipment was activated.[5]

Defense counsel challenged Officer Choate as to whether the responses that he received from Mr. Resa and Ms. Hernandez to his request to search the vehicle were actually intended to indicate their consent to the search. Officer Choate conceded that the consent that he received did not include permission to destroy the interior of the vehicle but denied that he had, in fact, destroyed the interior of the vehicle. Instead, he claimed

---

[5] From viewing the videotape, the Court notes that both defense counsel's and Officer Choate's estimates of the respective time periods estimated by them are accurate.

-11-

to have used common tools–like a screwdriver–to disassemble the rear interior of the vehicle. He did concede, however, that once he had identified the concealed compartment, he had used a pocket knife to cut a plastic cover inside the compartment.[6]

Officer Choate reiterated that he kept the density meter which he had used in connection with the subject stop calibrated on a regular basis. Defense counsel attempted to demonstrate that, notwithstanding any calibration, the density meter was capable of indicating incorrect information.

The Court found Officer Choate to be a credible witness.

## II. ANALYSIS

As noted above, in his instant Motion to Suppress, Mr. Resa challenges at least two, and actually three, discrete phases of the subject encounter - the initial stop of the vehicle in which he and Ms. Hernandez were traveling, the resulting detention of he and Ms. Hernandez following the stop, and the subsequent search of the vehicle. Because each of Mr. Resa's challenges require it to apply a distinct analytical framework, the Court will address the challenges to each phase separately.

### A. The Stop

As indicated above, Officer Choate stated that on the afternoon in question, he had two different reasons for stopping the subject vehicle. First, he had received an AMBER Alert to be on the lookout for a vehicle which was similar to that being driven by Mr. Resa. Second, in his opinion, according to Tennessee law, the weather conditions at the time he spotted the vehicle would have required the driver to have the headlights activated.

---

[6] The disassembly process is depicted in Defendant's Exhibits 6, 7 & 8.

The Court has been unable to find any reported case which directly addresses the issue of whether information provided to law enforcement in connection with a so-called "AMBER Alert" provides a sufficient basis for a traffic stop for purposes of the Fourth Amendment.[7] The Court assumes, however, without deciding, that an AMBER Alert could serve to justify at least a brief investigatory traffic stop in the same manner as a be-on-the-lookout (BOLO) notice to law enforcement. *See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 232-33 (1985); *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) ("[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop.")[8]

Officer Choate also testified that, at the time he stopped the vehicle in which Mr. Resa and Ms. Hernandez were traveling on the date in question, he believed that they were in violation of Tenn. Code Ann. § 55-9-406(b)(1), which provides that "[o]peration of headlights during periods of rain, as required in this section, shall be made during anytime when rain, mist, or other precipitation, including snow, necessitates the constant use of windshield wipers by motorists."

In this regard, it is important to note that the Court must evaluate Officer Choate's proffered basis for the stop against the standard of whether it was objectively reasonable,

---

[7] See, however, *Davis v. Novy*, 433 F.3d 926, 930 (7th Cir. 2006) (finding that "[g]iven that we live in a time of increasing crimes against children - what with 'Amber Alerts' and all - the limited intrusion of a brief traffic stop under circumstances like those present in this case cannot be easily labeled as unlawful.")

[8] The justification for any such stop would expire, of course, once the officer was able to determine that the basis for the stop did not exist. In this case, Officer Choate testified that after approaching and looking inside the vehicle, he was quickly able to determine that there was no child in the automobile in which Mr. Resa and Ms. Hernandez were traveling. Whether the stop may be extended based on other or additional suspicious behavior or circumstances is a separate inquiry addressed below in Part II.B of this Memorandum and Order.

given the totality of the circumstances. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court made clear that a determination of probable cause involves the exercise of a "practical, common-sense judgment." 462 U.S. at 244. Significantly, the Court observed that the establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause ...." *Id.* at 243 n. 13; *see also United States v. Moncivais,* 401 F.3d 751, 756 (6th Cir. 2005) ("The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (internal quotation marks and citation omitted)). Describing the perspective from which a reviewing court should evaluate a law enforcement officer's determination of probable cause when making a traffic stop, the United States Court of Appeals for the Sixth Circuit has held that "all probable cause determinations [are] fact-dependent and will turn on what the officer knew *at the time he made the stop.*" *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (emphasis in original).

As to Mr. Resa's arguments that Officer Choate's stated reasons for stopping the subject vehicle were a mere pretext designed to obscure the fact that Officer Choate's actual reasons for making the stop were impermissible grounds such as race or ethnicity, in *Whren v. United States,*, 517 U.S. 806, 813 (1996), the Supreme Court held that a law enforcement officer's actual motives are irrelevant in determining whether a traffic stop is improper. As long as the officer has probable cause (or even reasonable suspicion) to make a stop, the fact that the reason given is pretextual does not affect the validity of the stop for purposes of the Fourth Amendment. *Id.* at 813 ("Subjective intentions play no role

in ordinary, probable-cause Fourth Amendment analysis.") The United States Court of Appeals for the Sixth Circuit has stated: "We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *Ferguson*, 8 F.3d at 391.

It is clear from the evidence of record that, on the afternoon in question, Officer Choate had sufficient probable cause to stop the Defendant's vehicle. Pursuant to *Whren* and *Ferguson*, Officer Choate's true motivation for the stop, and any "profiling" of the Defendants as Hispanics or likely drug dealers that may have occurred, is irrelevant for purposes of the motion before the Court.

### B. The Detention

This is not the end of the inquiry, however. In the case at bar, Mr. Resa also argues that, notwithstanding whether Officer Choate's original basis for making the stop was valid, the subsequent detention of Mr. Resa was unreasonably protracted. Since the Government bases its justification for the search of the subject vehicle on the consent of the occupants, the period of detention which must be justified is the time between the point where the object for the initial stop was accomplished and the point at which the consent to search was given.[9]

It is clear in this Circuit that

> An ordinary traffic stop, however, is more akin to an investigative detention rather than a custodial arrest, and the

---

[9] The law in this circuit is clear that as long as the detention which gives rise to a request for consent to search a vehicle is reasonable, a law enforcement officer may ask a suspect for his or her consent to search notwithstanding the fact that the officer may not possess reasonable suspicion upon which to base such a request. *See United States v. Wellman*, 185 F.3d 651, 656-57 (6th Cir. 1999). Accordingly, it is incumbent upon the Government here to justify only the detention prior to the consent to search, not the request to search itself.

> principles announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), apply to define the scope of reasonable police conduct. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996). Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. *Palomino*, 100 F.3d at 449 (citing *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995).

*United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). It is equally clear, however, that detention of a suspect until the completion of radio checks regarding the vehicle and driver and the issuing of a citation for a traffic violation are "well within the bounds of the initial stop." *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996).

Here, Officer Choate testified that it was always his intention to issue a citation to Mr. Resa for his failure to operate his headlights during a period of precipitation, as required by Tennessee law. He also testified that 15 to 20 minutes might be a typical average time required to perform all checks and write the necessary citation. He also testified that, in the case at bar, the time period within which he might have otherwise been expected to issue a citation and release Mr. Resa was extended by Mr. Resa's and Ms. Hernandez's apparent inability to provide satisfactory and consistent answers to his questions regarding the circumstances under which they came to be in possession of the vehicle. It was well within these time periods that officer Choate received what he

reasonably believed was Mr. Resa's and Ms. Hernandez's consent to search the vehicle. Accordingly, and under all the facts and circumstances, the Court concludes that the detention of the Defendants following the initial stop was not unreasonably prolonged.

### C. The Search

Before turning to the merits of the various challenges to the search of the subject vehicle raised by Mr. Resa in his instant Motion to Suppress, the Court must first address a threshold issue raised by the Government in its Response [Court Doc. 41] - that is, whether Mr. Resa had a legitimate expectation of privacy in the rental vehicle involved in this incident so as to afford him what is referred to as "standing"[10] to challenge the subject search.

The Sixth Circuit, in *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001), stated:

> We acknowledge that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle. However, we refuse to adopt a bright line test, as the government seems to advocate, based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver. Such a rigid test is inappropriate, given that we must determine whether Smith had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances.

---

[10] As stated by the Sixth Circuit in *United States v Smith*, 263 F.3d 571 (6th Cir. 2001):

Technically, the concept of "standing" has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois*, indicated that the matter of standing in the context of searches and seizures actually involved substantive Fourth Amendment Law. The Court thus dispensed with standing as a "discrete analytic element apart from the merits" in such cases, instead requiring a defendant to prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct. We therefore use the term "standing" somewhat imprecisely to prefer to this threshold substantive determination.

263 F.3d at 581-82.

> See *Rakas*, 439 U.S. at 152, 99 S.Ct. 421 (Powell, J. concurring). "In considering the reasonableness of asserted privacy expectations, the [Supreme] Court has recognized that no single factor invariably will be determinative." *Id.*

263 F.3d at 586. Moreover, the *Smith* court made clear that the defendant seeking to suppress the search bears the evidentiary burden of establishing his standing to assert a Fourth Amendment violation. *Id.* at 582 (citing *United States v. Salvucci*, 448 U.S. 83, 86 (1980) and *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988), *amended by* 866 F.2d 147 (6th Cir. 1989)).

In *Smith*, the Sixth Circuit considered five factors which it found to militate, under the facts of that case, against application of the general rule depriving an unauthorized driver of a rental vehicle from asserting a privacy interest in the vehicle. Those factors were: (1) whether the defendant was a properly licensed driver, who could legally drive the vehicle in question; (2) whether the defendant was able to present the officer with a rental agreement and provide the officer with sufficient information regarding the vehicle; (3) whether the driver can identify some related individual who gave him possession of the vehicle (in *Smith*, it was the defendant's wife) or whether the purported authorized driver is "some unrelated third party;" (4) whether the defendant's related party had given him permission to drive the vehicle; and (5) most significantly, whether the defendant had a business relationship with the rental company such as having made a reservation, or presented it with a credit card number. *Smith*, 263 F.3d at 586.

Applying the factors identified in *Smith* in the order enumerated in the preceding paragraph against the facts of the instant case, only the first clearly militates in favor of according to Mr. Resa standing to challenge the search of the vehicle. Analysis of the

second, third and fourth factors requires the Court to weigh the testimony of Officer Choate regarding his assessment of the adequacy of the Defendants' responses to his questions against the sufficiency of those responses as suggested by Mr. Resa's counsel on cross-examination. The fifth factor, which the Sixth Circuit identified as the most significant, clearly militates against Mr. Resa being accorded standing to challenge the search.

In balancing Officer Choate's testimony regarding the second, third, and fourth factors against defense counsel's suggestions, the Court is left with the fact that Officer Choate's evaluation of the Defendants' responses, was reasonable, if not clearly beyond question. This being the case, and given that the *Smith* court makes clear that a defendant seeking to suppress a search bears the evidentiary burden of establishing his standing to challenge the search, the Court is left to the conclusion that Mr. Resa has not sustained his evidentiary burden of establishing that he had a legitimate expectation of privacy in the subject rental vehicle so as to afford him what has been referred to as "standing" to challenge its search. Thus, because Mr. Resa does not have standing to challenge the subject search of the vehicle in question, it is unnecessary for the Court to address the myriad challenges to such search as are posed by Mr. Resa in his papers and at the evidentiary hearing.

### III. CONCLUSION

For the reasons explained above, the Court finds that the subject stop of the vehicle, detention of the Defendants and search of the vehicle did not violate the prohibition against unreasonable searches and seizures as established in the Fourth Amendment to the

United States Constitution. Accordingly, Mr. Resa's Motion to Suppress [Court Doc. 39] is **DENIED**.

ORDERED this 17th day of March, 2008.

                                                          */s/Harry S. Mattice, Jr.*
                                                         HARRY S. MATTICE, JR.
                                                         UNITED STATES DISTRICT JUDGE